824 So.2d 409 (2002)
SUCCESSION OF Sidney LOUNSBERRY.
No. 01-1664.
Court of Appeal of Louisiana, Third Circuit.
May 8, 2002.
Rehearing Denied June 19, 2002.
Writ Denied October 25, 2002.
Kenneth O'Neil Privat, Crowley, LA, for Appellee: Errol Lounsberry.
*410 Homer Edward Barousse, Jr., Barousse & Craton, Crowley, LA, for Appellees: Errol Lounsberry and Ronald. Lounsberry.
Scott James Scofield, Scofield, Gerard, Veron, Singletary & Pohorelsky, Lake Charles, LA, for Appellant: Sidney Michael Lounsberry.
Court composed of MARC T. AMY, MICHAEL G. SULLIVAN and GLENN B. GREMILLION, Judges.
AMY, Judge.
The decedent executed a will leaving the entirety of his estate to one of his three sons. The two sons not named as beneficiaries filed suit seeking rescission of the will and a revocable management trust at issue. The petition alleged that the named son exerted undue influence over their father who, they contend, was suffering from a decline in mental health. The trial court found in favor of the plaintiffs, annulling the will and trust and removing the named son as executor and trustee. The defendant appeals. For the following reasons, we affirm.

Factual and Procedural Background
Errol Eugene Lounsberry, Ronald James Lounsberry, and Sidney Michael Lounsberry are the three adult sons of the marriage of Sidney and Pearl Lounsberry. Pearl died in April 1997, leaving a trust in which the couple's three sons were named as trustees. As trustees, the three sons controlled the couple's farmland along with Sidney. The events at issue in this case arose following Pearl's death.
Although Sidney had confected a will in 1989 leaving equal shares of his property to Errol, Ronald, and Michael, he executed a newer will on February 8, 1999. This will named Michael as the sole beneficiary of Sidney's property and created a trust naming Michael's descendants as the beneficiaries of any residuary legacy in the event that Sidney survived Michael. Michael was named as the executor. A revocable trust was also executed to which Sidney's property was transferred. Sidney and Michael were named as co-trustees. The record indicates the execution of the February 1999 will followed a period of increasing difficulty between Sidney and Errol. Much of the difficulties in the father-son relationship involved issues related to Errol's farming of family property. At various times, Sidney accused Errol of, among other things, poor farming practices on the property. One encounter, in particular, led to Michael calling the sheriff's department to file a complaint against Errol. Michael contends that his father requested that he do so. The record contains no evidence that charges were filed. Sidney died on September 2, 1999, at eighty-nine years of age.
Michael filed a Petition to File and Execute Statutory Testament and For Confirmation of Executor on October 2, 1999. The order confirming Michael as executor of the succession was subsequently signed. On November 5, 1999, Errol and Ronald (hereinafter referred to as "the plaintiffs") filed a Suit to Invalidate Trust Instrument and Last Will and Testament. The plaintiffs alleged that Sidney was mentally incapacitated at the time of the execution of the February 1999 will and that he was coerced into signing the instrument by the undue influence of Michael. Namely, the plaintiffs asserted that undue influence was exercised through false and misleading statements made by Michael regarding Errol and Ronald's actions. The petition alleged that Michael took these actions knowing of Sidney's "paranoia and schizophrenic nature[.]"
The trial court found in favor of the plaintiffs, sustaining the action to annul the February 8, 1999 will and trust on the *411 grounds of undue influence. The action to annul the will on the grounds of lack of testamentary capacity was dismissed, as was a claim to annul the will for failure to comply with required formalities.
Michael appeals the determination of the trial court, arguing that the trial court committed legal error in finding that the plaintiffs presented clear and convincing evidence of undue influence and, alternatively, that the trial court's determination was manifestly erroneous. Michael also contends that the trial court erred in setting an excessive bond. Finally, Michael asks that, if this court reverses the trial court's ruling, he be reinstated as testamentary executor and trustee of the Sidney Lounsberry Trust.

Discussion
The record contains extensive testimony relating to family member relationships following the death of Pearl Lounsberry. It is important to note that the plaintiffs and Michael offer vastly different accounts of Sidney's mental health. Michael explained that Sidney was saddened by Pearl's death, but that there were no significant changes in his behavior during the time at issue. The plaintiffs contend, however, that Sidney became increasingly depressed, irrational, and subject to more frequent mood swings. The plaintiffs also presented the view that Sidney's ability to care for himself suffered as his personal hygiene and eating habits deteriorated. As for his periods of anger, Michael testified that he felt that Sidney had a reason for them. Even the attorneys involved in representation of Sidney during the period in question had differing accounts of his state of mind. As will be seen in the discussion below, the plaintiffs presented testimony related to increasing tension between themselves and Sidney, as well as Sidney's increasing reliance on Michael during that period. In this appeal, Michael questions both the trial court's determination that his actions constituted "undue influence" and the conclusion that any actions seen as undue influence were proven by clear and convincing evidence. We address these complaints together.
Article 1479 of the Louisiana Civil Code provides for the nullification of a donation that is procured through undue influence. It provides:
A donation inter vivos or mortis causa shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor.
Furthermore, Comment (b) to Article 1479 provides, in part:
[E]veryone is more or less swayed by associations with other persons, so this Article attempts to describe the kind of influence that would cause the invalidity of a gift or disposition. Physical coercion and duress clearly fall within the proscription of the previous Article. The more subtle influences, such as creating resentment toward a natural object of a testator's bounty by false statements, may constitute the kind of influence that is reprobated by this Article, but will still call for evaluation by the trier of fact. Since the ways of influencing another person are infinite, the definition given in this Article is used in an attempt to place a limit on the kind of influence that is deemed offensive. Mere advice, or persuasion, or kindness and assistance, should not constitute influence that would destroy the free agency of a donor and substitute someone else's volition for his own.
The above comment is helpful guidance, as the instant case essentially involves a contest as to whether Michael's actions were "subtle influences, such as creating resentment *412 toward a natural object of a testator's bounty by false statements ..." or were "[m]ere advice, or persuasion, or kindness and assistance...." We are asked to consider both the trial court's finding that they constituted the former as well as the finding that it was demonstrated by the applicable burden of proof.
La.Civ.Code art. 1483 states:
A person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence. However, if, at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence.
Following several days of trial, the trial court rendered the following oral reasons for ruling, first setting forth the codal framework and then outlining its findings of fact. The trial court stated:
I am about to make a ruling in this case, but I am fully aware that, in making a ruling in this case, I am not going to solve the problems that this family has. And I am very sorry that that is the situation.
But the function of this Court is simply to make a legal ruling. And, unfortunately, we cannot solve the deeper problems that exist. And I realize that those will continue to exist despite whatever ruling I might make this evening.
I have already issued a ruling on the issue of testamentary capacity and the formality of the will, and I'm not going to repeat that. I am at this time, however, going to make a ruling on the remaining issue, which is whether there was undue influence exerted in this case.
Let me just make a couple of statements about the legal standards for undue influence. There is no single definition under our law for undue influence. Undue influence is something that a trier of fact must determine the existence of considering all the facts of the case. Undue influence is influence that destroys the free agency of the donor. And that can be done in a myriad of ways.
It's also imperative, in considering undue influence as it relates to a donation or a will, that the undue influence be operational at the time of the donation or, in this case, at the time of the making of the testament. And the Court notes that creating resentment toward a natural object of the testator's bounty, such as his children, is, in fact, the exertion of undue influence.
I want to make a couple of statements about Mr. Sidney Lounsberry's condition following his wife's death. We can quibble about the definition of depression, confusion, delusion, et cetera, but there is no doubt in my mindAnd I wonder how anyone could sit in this courtroom and listen to all of the testimony and not feel that Mr. Sidney was severely negatively impacted by his wife's death. And I think we can all understand why that would be so. And, also, I think the evidence is clear that he never recovered from the negative impact of his wife's death. Each of the children, in their own way, I think, may have had an idea about what would have helped their father at this stage in his life. I don't believe that any of the children set out at that time with a plan to use his vulnerability to their advantage.
But it's clear to me that, as events transpiredAnd I am convinced that many of Mr. Sidney's actions were irrational *413 and were the result of or were exacerbated by his delicate emotional state.
It's clear to me that, as events transpired, that the tactic that Mr. Michael Lounsberry pursued clearly created resentment toward Ronald and Errol. While I accept the notion that, initially, his desire may have been to support his father, there is no way that the Court can accept, as events transpired, that the actions that Michael Lounsberry took were in any way facilitating an improvement in their father's emotional condition. But, to the contrary, those were actions which facilitated his irrational acts.
And, as a couple of examples, the calling of creditors to tell them to quit sending bills without taking any independent action to verify whether that was or was notwhat Mr. Sidney Lounsberry was claiming about the bills was or was not correct.
I was particularly impressed by the fact that, following the incident on the road, that the police were called. There was clearly, at that point, no danger to Mr. Sidney Lounsberry, and the calling of the police and involving the police and filing a report at that time could have served no useful purpose, other than exacerbating and creating resentment in that regard. And the fact that there was no follow-through with any charges following that, I think, validates that position.
Again, as I said, I don'tI don't believe that this was a plan that was devised at the beginning, but I think that, as events transpired, it became clear that the resentment that Mr. Sidney Lounsberry had toward Ronald and Errol could easily be facilitated. And I think that happened in this case. And I believe that that facilitation of that resentment rises to the level of undue influence such as would invalidate his testament of February 8th, 1999.
Michael contends that the trial court erred as a matter of law in finding that his actions constituted undue influence. Instead, he argues, the trial court's findings essentially reflect that he rendered assistance to his father. In particular, Michael points out that he called the sheriff's department to file a complaint against Errol, but that he did so at his father's request. He contends that the complaint was not disproportionate to the alleged incident and that he had no duty to independently verify the basis for Sidney's complaints. Similarly, he contends that he intervened on his father's behalf to complain about bills from creditors only after requested to do so by his father. In his brief, he writes that "it is axiomatic that [he] could not unduly influence his father by simply carrying out his father's instructions. By holding that these acts of assistance constituted undue influence, the trial court committed legal error." Also, Michael contends that because the trial court determined that Mr. Lounsberry's resentment toward Errol and Ronald could be facilitated, it concluded that this resentment preexisted any assistance he rendered to his father. Thus, "such resentment was clearly not `a product of the alleged influence of Michael. Consequently, there was no undue influence as a matter of law." He goes on to state that he "could not have `so impaired' his father into believing what Sidney already believed. Accordingly, the trial court's legal errors warrant reversal."
First, we find no merit in Michael's contention that the trial court's determination that resentment preexisted any assistance bars a finding of undue influence. The trial court's ruling indicates that Michael's actions exacerbated a condition. In *414 other words, the resentment reached the level of Sidney altering his will only because of Michael's actions. The record can fairly be viewed as supporting this conclusion.
The plaintiffs presented the testimony of Dr. Paul Ware, an expert in the fields of psychiatry, neurology, and forensic psychology. Dr. Ware testified that he had listened to the testimonies of all of the witnesses and reviewed Sidney's medical records. He explained that, not only did Sidney suffer from a number of physical ailments during the last years of his life, but that he believed that Sidney demonstrated indications that he suffered from mild dementia prior to the death of his wife, but that within six months of her death, he was significantly disturbed, and even delusional.
Dr. Ware explained that Sidney had been a tough, opinionated person who would become upset when those around him did not agree with him. However, the family recognized this tendency and would help Sidney regain his "emotional equilibrium" following an outburst, and redirect him. Dr. Ware explained that, prior to Pearl's death, the mild dementia manifested itself in more frequent references to past events and the increasing occurrence of mood swings, resulting at times in outbursts of such a nature that Pearl would call family members for assistance. Dr. Ware stated that "the family worked to contain him, to calm him and so forth."
Following Pearl's death, however, Sidney became clinically depressed according to Dr. Ware. He stated that, "in addition,... not only was he depressed, but probably six months after the death of his wife, with his dementia, with his depression, he clearly became delusional." Dr. Ware defined delusion as a misperception of one's environment. He stated that, although Sidney always had trouble moving past problems he had with others, they did not "consume his life." However, Dr. Ware explained that "when he started to become, in my opinion, delusional, particularly around his oldest son, Errol, that never, never changed. That became fixed[,] it was an everyday thing."
Dr. Ware further testified as to the role he felt Michael's actions played in Sidney's ultimate mental disposition. Dr. Ware explained that with a person suffering from delusion, "what you don't want to do is in any way validate it or encourage it or make them think it's a real thing. And, unfortunately, that happened." When asked about the effect of reinforcing delusions, Dr. Ware stated:
[I]f you reinforce a delusion, it's like the reinforcement of any other thing you believe. But, if you reinforce a false beliefIf there's any doubt or question about it at all, it goes away. And, the more that is reinforced, it's likeit's like putting gasoline on a fire. It just It just inflames it. It makes it more and more and more.
And it's so clear to me that Michael I'm not sure if it's from a loving, caring place or from what place. But not only did he just agree with his dad about these things, but even went forthat least as I see itin terms of taking legal action about these things.
While Michael, in his brief to this court, characterizes his actions as assistance to Sidney, the trial court was not required to view these actions without regard for the evidence of Sidney's declining mental health. Stated differently, similar assistance rendered to a testator without such a predisposition could be viewed purely as helpful assistance, but Sidney was uniquely situated and vulnerable to seemingly innocuous acts. Both Dr. Ware and the plaintiffs' witnesses testified as to Sidney's *415 deepening depression and more frequent mood swings following his wife's death. Although the trial court's reasons do not specifically refer to Dr. Ware or his testimony, the reasons for ruling reflect acceptance of the evidence presented by the plaintiffs insofar as they describe Sidney's "delicate emotional state" and facilitation of resentment existing toward Ronald and Errol. Only in the context of this background, can the actions at issue then be considered.
Further, and in view of this finding, we find no merit in Michael's assertion that his actions could not be viewed by the trial court as sufficient to constitute undue influence. Errol described his relationship with his father, explaining that it had been a close one throughout his life, as he lived in a home next to his parents, spent holidays and weekends with his parents, and worked with his father as a farmer. He explained that his father often praised his efforts and seemed proud of the work he accomplished on the farm. When asked to explain when Sidney's attitude began to change, Errol explained:
I bought a farmAnd I believe we ended up passing the deal somewhere toward the end of the year, but I put a bid in in October. I bought a farm so my son could start farming again. And that was in '97.
And daddyWhen I did that, daddy says: There's no sense in you doing that, you're working too hard already, you have too much to do. AndYou know, he kept bragging on me all the time about all the things that I do. He would embarrass me. But that aggravated him because I bought the farm. And I don't know why.
And then, after that, it was just he was so irritable, and he keptit kept going, and I wouldThen it got to where I wouldwe'd talk about something, agree on something, I'd come back three days later, he'd come back and say, no, it wasn't that way at all, he wanted to change the deal.
Errol explained that he had previously handled many of his parents' business affairs. He denied that Michael had ever had any complaints with regard to the way he conducted that business, even refusing to be placed as an executor on Sidney's 1989 will. Errol explained that he had asked Michael if he cared to be named executor, but that Michael "didn't want to be on it. He said, no, I didI was close to him, and I did everything. He did not want to do that." In 1998, however, Sidney began to accuse Errol of stealing, beginning with cash his mother kept at home at the time of her death. He explained that when he showed the cash to his father, Sidney's response was to tell him that he was lying and that he had stolen it. These complaints continued, leading to the accusation regarding his farming practices.
Errol testified that when he asked his father who told him he was stealing, Sidney told him that it was the computer. Ronald explained the deterioration of the relationship and the accusations of theft as follows:
Q. Well, theat the point in time where relations deteriorated and issues were raised regarding your brother Errol's continuing to farm the Vermilion Parish Farm.
A. At one point in time, he said: Mike's computer says Errol's stealing. And, you know, of course, I said: Well, dad, that'sErrol's not stealing.
Q. So you disagreed with your father?
A. Well, I just, in trying to comfort him andYou know, if he's upset about something, all you did was try to comfort him and sit there and talk to him. *416 And, hopefully, he would feel better about whatever his problem was.
Q. Perhaps the word "disagreement" was inappropriate. Did you try to tell your father that you didn't believe that that was true?
A. Well, yeah. But it was pointless to continue, you know. And justAnd I didn't want to argue with him about it. All I did was say: You know Errol's not stealing. And I'm sure, if Errol owes you anything, between you and Errol, he'll take care of it.
Q. What did he say specifically about how Michael's computer proved that Errol was stealing?
A. Oh, I don't know. I didn't even get into that. ThatYou know, I didn't put much in that, myself. I knew better.
The record does not reveal any basis on which the trial court was required to conclude that Sidney's accusations against Errol had any foundation in reality. On this same issue, Charles Britt, a farmer operating one of Sidney's fields explained that Sidney visited him and was upset and crying on these visits. He informed Mr. Britt that Errol was no longer farming his Lake Arthur property and that "money was missing." Mr. Britt testified as follows:
Q. And did he tell you how much he thought was missing?
A. He told me $100,000.
Q. And did hewho was present when he told you that?
A. Well, Mr. MikewhenThe first day that they came, Mr. Sidney told me there was $100,000 missing. But Mr. Sidney told me that the second time, also, when he came by himself?
Q. Did he tell you how he learned that $100,000
A. He told me Mr. Mike had put it on the computer and money was missing. I mean, the money was missing.
Q. So he told you specifically it was Mr. Michael Lounsberry
A. Mr. Mike put it on the computer, yes, sir.
Q. who told him there was $100,000 missing?
A. There was $100,000 missing.
MR. BOUCHNER: Objection to the characterization of that question, Your Honor.
THE COURT: What's your objection?
MR. BOUCHNER: Mr. Barousse just asked if it was Michael that told him it was $100,000, and I don't think that that was the response, that Michael told him it was $100,000 that was missing.
MR. BAROUSSE: No.
THE COURT: Well, he said that Michael
THE WITNESS: No, I didn't say that.
THE COURT: He said Michael put it on the computer and figured out that $100,000 was missing. That's what the witness testified to.
THE WITNESS: Yes.
THE COURT: Okay. I heard it.
THE WITNESS: I mean, that's all he said to me.
No evidence was presented indicating the absence of any funds.
Similarly, testimony was presented regarding requests made by Michael to creditors concerning bills Sidney received for farming expenses. Sidney believed that these bills related to Errol's theft or mismanagement of his property. Again, the trial court was not required to find that the evidence did not establish that the bills were in error or in any way related to a scheme by Errol. At Sidney's request, Michael complained about the bill, telling the creditors to stop sending them to his father. Michael contends that he was only *417 carrying out his father's request and again, had no duty to verify whether the complaints were legitimate.
While Michael argues that he was not required to independently verify Sidney's allegations, the trial court could have concluded that his attending to baseless complaints affected Sidney's perception of reality and aggravated any preexisting resentment Sidney had toward the plaintiffs. Similarly, Errol testified regarding an appointment that had been made for Sidney with a neurologist. According to Michelle Deshotel, Errol's daughter, the appointment was made due to concerns over Sidney's increasing mood swings. Errol explained that the neurologist's office sent a questionnaire for Sidney to complete and that Sidney was prepared to go, but that the day prior to the evaluation, he asked for the appointment to be cancelled, "that he had enough doctors he was going to see." Errol explained that he repeatedly asked Mike for assistance in obtaining medical help. He stated that:
The third time, I remember exactly. I had called his wife and asked her: MikeAnd I told her: Mike needs to stand up and be counted. He needs to help us.
So Mike was at my father's house when I gotI got in my pick-up, drove over there. When I got there, I said: Mike, he's being so unreasonable and so irrational, you got to help me. And Mike's answer was, he says: You've always looked down on us. And he says: And we're tiredwe're tired of that.
Michael contends in his brief that Sidney could have viewed attempts to have him undergo examination by a neurologist as an attempt to have him placed in a nursing home, a fear Michael contends was expressed by Sidney. In any event, the trial court could have viewed this type of activity as further evidence of validating Sidney's fears.
In sum, Michael's actions could, under other circumstances, be those viewed as assistance. However, given testimony regarding Sidney's disposition, the trial court's finding of increasing mental instability, and susceptibility, along with the questionable, marginal nature of Sidney's complaints, his conduct can fairly be viewed as that described in Comment (b) of Article 1479 which states: "The more subtle influences, such as creating resentment toward a natural object of a testator's bounty by false statements, may constitute the kind of influence that is reprobated by this Article, but will still call for evaluation by the trier of fact." This determination was made by the trial court in view of testimony indicating that, following Pearl's death, Sidney began to rely on Michael, who was given power of attorney and who would accompany his father to his attorney and was told of Sidney's ultimate decision to confect a new will. We find no error in the court's determination that the type of behavior described by the plaintiffs' witnesses, given the factual background of this case, constitute undue influence.
Furthermore, we find no manifest error in the numerous factual findings incorporated in the trial court's findings. The trial court was presented with evidence that could have supported a view in Michael's favor. Again, strikingly different accounts of Sidney's mental health during the time between Pearl's death and the execution of the will in February 1999. The trial court even heard from Sidney's acquaintances that he would discuss the possibility of writing a new will. One witness testified that Sidney stated Michael was the only son on whom he could rely. Sidney's barber testified that Sidney regularly visited his shop following Pearl's death, that Sidney regularly complained about Errol, and that due to the complaints, he suggested to Sidney that the *418 plaintiffs be disinherited. Gerald Hoff-pauir, who described Sidney as his great-uncle, testified that Sidney told him he was upset with Errol and wanted to leave everything to Michael, but that Michael did not want it. Given this evidence favorable to Michael, the trial court made the clear decision to favor the version of events and the witnesses presented by the plaintiffs. The court did so after viewing and hearing from all three sons. We find no manifest error in the trial court's credibility determinations and no manifest error in the conclusion that the witness statements were of such a nature as to constitute clear and convincing evidence of undue influence.
Given our resolution of the defendant's argument regarding the trial court's legal and factual findings, we do not address the remaining assignments of error. These assignments of error are moot.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assigned to the defendant, Michael Lounsberry.
AFFIRMED.