STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

14-274


SUCCESSION OF

JACOB BORDELON



**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2012-902762-A
HONORABLE WILLIAM BENNETT, DISTRICT JUDGE

**********

**JOHN D. SAUNDERS**
**JUDGE**

**********

Court composed of John D. Saunders, Billy Howard Ezell, and J. David Painter, Judges.


**AFFIRMED.**

**Robert Ronald Faucheux  Jr.**
**Law Offices of Robert R. Faucheux**
**P. O. Box 1960**
**Laplace, LA 70069**
**(985) 651-2888**
**COUNSEL FOR APPELLANT:**
    **Lucas Desselle**

**Henry Howard Lemoine, Jr.**
**Attorney at Law**
**607 Main St.**
**Pineville, LA 71360**
**(318) 473-4220**
**COUNSEL FOR APPELLANT:**
 **Lucas Desselle**

**W. Jay Luneau**
**Luneau Law Office**
**1239 Jackson St.**
**Alexandria, LA 71301**
**(318) 767-1161**
**COUNSEL FOR APPELLEE:**
 **Marilyn Bordelon**

**SAUNDERS, Judge.**

This is a succession case dealing with a will executed in 1999, a codicil executed in 2010, and second codicil executed in 2011. At trial, Appellees asserted the 2011 codicil was invalid because it was executed at a time the decedent lacked testamentary capacity and was the product of undue influence. The trial court found the decedent lacked testamentary capacity at the time the 2011 codicil was executed and that Appellant exerted undue influence on the decedent. On appeal, Appellant raises three assignments of error. Appellees answered the appeal, asserting the trial court erred in finding the 2011 codicil was valid in form. For the reasons discussed herein, we affirm the trial court's judgment.

FACTS AND PROCEDURAL HISTORY

This case involves the testament of Jacob Bordelon (hereafter "decedent") and two codicils.

The decedent was the father of three children, Marsha, Vickie, and Wade, and was married to Marilyn Bordelon. Marsha has a son, Lucas Desselle, who is the Appellant. Vickie had two sons, Clint and Jase Arnouville. The decedent made his living farming and raising cattle.

The decedent executed an original will on August 23, 1999, dividing naked ownership of most of his estate amongst his children with a usufruct in favor of Marilyn. Some items were bequeathed to his children free of the usufruct in favor of Marilyn. On June 8, 2010, to reflect the acquisition of additional property, the decedent executed a codicil to the original will. The 2010 codicil disposed of additional property and amended some former legacies. Appellant was not a legatee in either the 1999 will, or the 2010 codicil. On December 14, 2011, the decedent executed a second codicil. The 2011 codicil granted naked ownership of

the property formerly bequeathed to Wade to Appellant. Wade was left a usufruct of the property formerly bequeathed to him in naked ownership. Several items were bequeathed to Appellant in full ownership, unencumbered by the usufruct in favor of Wade. Appellant had never been a legatee before.

The decedent died on August 8, 2012. Appellant filed a petition to probate the decedent's 1999 will and the 2011 codicil on October 16, 2012. On October 17, 2012, the original will and 2011 codicil were probated and Appellant was appointed provisional administrator of the decedent's estate. On November 9, 2012, the decedent's wife, Marilyn, filed a Motion to Remove Provisional Administrator, to File Original Will and Codicil, to Appoint Executrix, for Authority to Lease Property, and to Continue Business Enterprises, in which she alleged the 2011 codicil was unenforceable because the decedent lacked capacity to execute it and because Appellant unduly influenced the decedent. A judgment probating the original will and 2010 codicil was issued on May 10, 2013. On May 14, 2013, Appellant filed a Motion to Re-Fix Hearing on Rule to Show Cause, alleging the May 10, 2013 judgment did not address the validity of the 2011 codicil. After trial on the merits, judgment was rendered on January 21, 2014, declaring the 2011 codicil null. It is from this judgment that this appeal arises.

In June of 2011, Dr. James Quillan conducted a mental status examination on the decedent, reporting that the decedent was not oriented as to time but was able to speak fluently and coherently. His deposition testimony was admitted into evidence at trial. Multiple witnesses testified that the decedent behaved unusually and was confused in the months surrounding the execution of the 2011 codicil. However, the attorney who notarized the 2011 codicil testified that the decedent appeared coherent on the two days he met with him, including the day the 2011 codicil was executed. On the evening of December 14, 2011, following the

2

execution of the second codicil, the decedent inappropriately discharged a firearm in his home.

Appellant spent a significant amount of time with the decedent throughout his life and had a close relationship with the decedent. For many years, Appellant helped the decedent with the farming and cattle operations. In the last few years of the decedent's life, the frequency of their contact decreased. However, Appellant's girlfriend, Kasey, spent a substantial amount of time with the decedent in the year preceding his death, often taking him to doctors' appointments, to visit friends, to joyride, and to visit Appellant and others while they worked in the field. Marilyn primarily cared for the decedent in the time preceding his death, although she was often assisted by her children and Kasey.

In his appeal, Appellant raised the following assignments of error:

ASSIGNMENTS OF ERROR:

1.  The trial court erred in finding that the decedent lacked testamentary capacity.

2.  The trial court erred in finding that Appellant exerted undue influence on the decedent.

3.  The trial court erred in denying Appellant's motion in limine to exclude the deposition testimony of Dr. James Quillin.

ASSIGNMENT OF ERROR NUMBER ONE:

Appellant asserts that the trial court erred by declaring the 2011 codicil null on the grounds that the decedent lacked testamentary capacity. This assignment of error is without merit.

"An appellate court may not set aside a trial court's finding of fact absent manifest error or unless it is clearly wrong." *Succession of Moss*, 00–62, p. 3 (La.App. 3 Cir. 6/21/00), 769 So.2d 614, 617, *writ denied*, 00–2834 (La. 12/8/00),

3

776 So.2d 462 (citing *Rosell v. ESCO*, 549 So.2d 840 (La.1989)). "[T]he question of testamentary capacity is a question of fact." *Succession of Ellis*, 486 So.2d 260, 262 (La.App. 3 Cir.1986).

The trial court found the evidence showed the decedent "had the capacity to execute the document and to understand the nature of the document, [but the decedent] did not have the capacity to understand the consequences thereof," and, thus, that decedent "did not have the necessary testamentary capacity to execute the Codicil in December 2011." Therefore, the trial court found the 2011 codicil invalid. To warrant reversal, Appellant must show that the trial court's finding that the decedent lacked testamentary capacity was manifestly erroneous or clearly wrong.

To have the capacity to donate inter vivos or mortis causa, a person must be able "to comprehend generally the nature and consequences" of his action. La.Civ.Code art. 1477. "Capacity to donate mortis causa must exist at the time the testator executes the testament." La.Civ.Code art. 1471. A person challenging the capacity of a testator must prove lack of capacity at the time the testament was executed by clear and convincing evidence. La.Civ.Code art. 1482(A).

After reviewing the record, we find ample evidence to support the trial court's finding that the decedent lacked testamentary capacity at the time the 2011 codicil was executed. James W. Quillan, Ph.D., a medical psychologist who holds a post-doctoral Master's Degree in Clinical Psychopharmacology, performed a mental status examination on the decedent on May 25, 2011. He testified that, in the course of the mental status examination, the decedent indicated he believed the year was 1920. Additionally, Dr. Quillan's notes indicate the decedent's attention and concentration were limited, remote memory was fair, and insight and judgment were diminished.

4

Following the mental status examination, Dr. Quillan recommended cognitive status evaluation. In accordance with this recommendation, under the supervision of Dr. Quillan, a technician conducted the Repeatable Battery Assessment of Neuropsychological Status (RBANS) test. This test has been peer-reviewed and is generally accepted in the field as the appropriate test to administer to determine cognitive function. Dr. Quillan explained the results:

A.   He functioned well below the first percentile relative to his age group.

Q.   Tell us what that means in lay terms, how his cognitive function could be--

A.   If you would scientifically pick a hundred elderly patients in the general population, his performance would fall -- would correspond to the -- back that up. Ninety-nine out of 100 of that sample would do better than he did.

Q.   So he was at the lowest end of the scale in his cognitive function?

A.   Yes.

Q.   And, again, that's comparing him to persons in their 80s, not with the rest of the population?

A.   Correct.

Dr. Quillan further explained:

Q.   And then when you also went on to say that it would be important to make appropriate accommodations "with respect to disposition and planning at discharge," tell me what you meant by that.

A.   Somebody would have to be responsible for him. He would not be independently responsible for his own behavior, taking care of himself.

Q.   So from a mental standpoint, he was not able to take care of his daily needs?

A.   Correct.

Dr. Quillan further acknowledged the decedent's condition was "continually deteriorating" and explained "he would not get better." When specifically asked if he believed the decedent had capacity in December 2011, Dr. Quillan explained:

5

> Q. In your opinion, did Mr. Bordelon have the mental capacity to do a will on December 14, 2011?
>
> A. He did not have the capacity as of my examination in May of 2011. And based on the convergent validity of the other medical records, I do not believe he had it in December 2011.

Appellant criticizes the trial court's reliance on the opinion of Dr. Quillan because his only contact with the decedent was brief, took place several months prior to the execution of the 2011 testament, and was primarily based on the RBANS test, which was administered by Dr. Quillan's technician. This criticism is misplaced. Based on the mental status examination, Dr. Quillan recommended further cognitive function testing. Dr. Quillan's technician administered the RBANS test, a peer-reviewed and field-accepted method to evaluate the neuropsychological status of adults. The RBANS test administration and scoring are standardized. The test subject is asked a series of standardized questions. The raw data generated from the answers is assigned a numerical value. Based on the mental status examination and the results of the RBANS test, Dr. Quillan was able to opine that the decedent suffered from seriously diminished cognitive status. The length of time Dr. Quillan actually met with the decedent was not critical to his findings.

Further, Dr. Quillan's testimony is not the only evidence in the record which supports the trial court's finding that the decedent lacked capacity to execute the 2011 testament. Medical records indicated the decedent was often confused and disoriented as to time in the months following the execution of the 2011 codicil. Additionally, multiple family members testified to the decedent's diminished mental status. The decedent's daughter, Vickie, testified that he made inappropriate comments that were very out of character for him. She further testified that the decedent refused to take his medications at times because he

believed his family was trying to harm him. The decedent's son, Wade, testified that the decedent confused and forgot stories he had told for years. Wade and the decedent's grandson, Jase Arnouville, testified that the decedent told them that he had gone to Las Vegas, when he had actually never been. Additionally, Wade and Marilyn testified that the decedent was often confused about his medications. Marilyn testified that the decedent sometimes called the pharmacy to refill his prescriptions before he needed them. The decedent's grandson, Clint Arnouville, testified that the decedent would sometimes allege that his personal effects, such as clothes, accessories, and medications had been stolen. When Clint retrieved the items and showed them to the decedent, Clint testified that the decedent would argue that the items had not been there before.

Several witnesses, including the attorney who prepared and notarized the 2011 codicil, testified that the decedent appeared normal to them in their conversations with him. Appellant asserts their testimony proves the decedent was capable at the time of execution of the 2011 codicil. Dr. Quillan explained:

> Q. You state that his language function is well preserved. What exactly does that mean?
>
> A. It means he could name objects, and he could talk, and –
>
> . . . .
>
> A. He could talk. His speech was normal.
>
> Q. He could have somewhat kind of a normal conversation with you?
>
> A. Yes.
>
> Q. But his cognitive reasoning was still at the lowest levels for his age group?
>
> A. Yes. In other words, if you did nothing other than just sit down and talk to him, you might not know anything was wrong with him.

Although the decedent spoke normally to the attorney and the other witnesses, Dr. Quillan's uncontroverted testimony clearly established that the decedent retained the ability to converse normally, despite lacking normal cognitive function. Given Dr. Quillan's undisputed testimony concerning the decedent's ability to carry on a normal conversation, it was not manifestly erroneous for the trial court to refuse to rely on the testimony of the attorney and other witnesses concerning the decedent's capacity.

Finally, perhaps most indicative of the decedent's compromised judgment is an incident that occurred on the evening of December 14, 2011, the date the second codicil was executed. There is much speculation as to what actually occurred. Marilyn, Wade, Vickie, and Clint speculated that the decedent had tried to kill himself. Appellant, Marsha, and Kasey testified that the decedent told them he had tried to kill his wife, Marilyn. Jase testified that the decedent told him he "didn't have the strength to pick [the gun] up to…kill himself." What is clear is that the decedent obtained a handgun and accidently discharged the weapon into the ceiling of his bedroom, after which Marilyn wrestled the gun away from him. This incident, coupled with his explanation of it to Appellant, Kasey, and Marsha, support the conclusion that the decedent was suffering from impaired judgment on the date the second codicil was executed.

Although the trial court's distinction between having the capacity to understand the nature of the codicil, but not the consequences was rather awkward, the trial court's ultimate judgment was correct. The uncontroverted expert testimony of Dr. Quillan, the testimony of multiple witnesses concerning the decedent's out-of-character and confused behavior, the medical records indicating the decedent suffered from confusion and disorientation as to time in the  months following the execution of the 2011 codicil, together with the incident involving

the gun and the decedent's startling explanation of the incident, provide ample support for the trial court's conclusion that the decedent was incapable on the date he executed the 2011 codicil. Accordingly, we find that there is no basis for this assignment of error. The trial court's decision is supported by the record, and, thus, is not manifestly erroneous or clearly wrong.

ASSIGNMENT OF ERROR NUMBER TWO:

Appellant asserts that the trial court erred in finding he exerted undue influence on the decedent. Having determined that the decedent lacked testamentary capacity to execute the 2011 codicil, Appellant's second assignment of error need not be addressed. However, for the purpose of completeness, we now turn to this assignment.

Whether a testator is subject to undue influence is a finding of fact and subject to the manifest error standard of review. *Succession of Lounsberry*, 01–1664 (La.App. 3 Cir. 5/8/02), 824 So.2d 409, *writ denied*, 02–2000 (La. 10/25/02), 827 So.2d 1163. Louisiana Civil Code Article 1479 states:

> A donation *inter vivos* or *mortis causa* shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor.

Louisiana Civil Code Article 1483 establishes that, at trial level, "[a] person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence." "To prove a matter by 'clear and convincing' evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence." *Succession of Dowling*, 93-1902 (La.App. 3 Cir. 2/25/94), 633 So.2d 846, 855. The trial court noted that the decedent was "almost always was under the constant supervision of Lucas, Kacey (sic), or Marsha" and that the 2011 codicil "was executed at a time

9

when Jacob was almost totally under the influence of Lucas, Kasey and Marsha," and found the codicil to be a product of undue influence. However, after a thorough review of the record, we find no evidence that Appellant exerted undue influence on the decedent.

The evidence shows that the decedent always had a close relationship with Appellant. For many years, Appellant helped with the farming operations and had been a large part of his grandfather's life. Appellant spent no more time with the decedent in the time surrounding the execution of the 2011 codicil than he had throughout his life. In fact, the record shows the opposite to be true. Although Appellant and the decedent had always been close, the frequency of their contact actually declined in the last few years of the decedent's life. Appellant explained:

> Q. And you spent a lot of time around him as well in the last couple of years of his life didn't you?
>
> A. I spent a lot of time around him all my life Mr. Luneau.
>
> Q. Okay. When you were farming and all that kind of stuff after your grandfather couldn't get out as much I take it you probably didn't spend as much time with him then?
>
> A. Well, no he wasn't you know he couldn't get around. You know I would go visit him at home, but he would call me during the day and what you doing? Where you at? How's it going? Things of that nature.

In fact, even Marilyn testified, Appellant "[n]ever came to visit. Never took him to a doctor's visit. Never stayed with him in the hospital. But, that was his choice. He said he didn't like that. That was his choice." Further, although Appellant visited briefly with the decedent on the date the 2011 codicil was executed, Appellant testified that he did not ride with the decedent to the attorney's office that day.

The record establishes that other family members spent much more time with the decedent than Appellant. Wade, Vickie, and Marsha testified that Marilyn

was the decedent's primary caregiver, with assistance from her children, in-home care providers, and Kasey. Marilyn, herself, testified:

Q. There was another instance when in the Home Health records where one of the nurses had came in and you had gone [sic] run an errand and he told them that you had been [sic] for two days.

A. Oh, yea.

Q. Is that true had you been gone for two days when that happened?

A. No, indeed I never left. It was twenty-four care. Night and day.

Q. Okay.

A. Night and day.

Q. Did you ever have an opportunity to leave the house and go somewhere to run an errand or to do something like that?

A. Well, I would I'm not a person to go. I don't like to visit. I like to stay home so I just maybe just go to the grocery store and come back. Sometimes I would go to mass on Sunday. He didn't sleep at all at night but when it break day he would take a nap. He would like want to go to sleep. And if it was like that that he was sleeping or something I could look I am going to mass Boy. I would go to mass that lasted thirty-five or forty minutes at the longest and I would come back and you know he was all right. But I never went anywhere. Oh, no.

The record shows that Kasey sometimes took the decedent to visit Appellant in the field. However, during most of these visits, other workers were present. Given that Appellant rarely visited the decedent, alone or otherwise, and the decedent was almost always under the supervision of Marilyn or others, it is difficult to imagine when the opportunity may have presented itself for Appellant to exert any amount of influence on the decedent regarding the will.

Each witness also testified that Kasey spent a significant amount of time with the decedent. She often took him "riding," to doctor's appointments, to the pharmacy, to visit friends, and to visit Appellant and others while they were working in the fields. Several witnesses testified that she stayed in the hospital

with the decedent for several days during his last hospital visit. However, Appellees only argue that Appellant unduly influenced the decedent, not Kasey. Further, evidence that Kasey helped the decedent and kept him company is not, alone, evidence of undue influence.

The burden of proving undue influence is high. Considering that Appellant had always had a close relationship with the decedent, that Appellant's contact with the decedent declined in the time period surrounding execution of the 2011 codicil, that Appellant did not go to the attorney's office on the date the 2011 codicil was executed, the witnesses' consistent testimony that it was Marilyn who was the primary caretaker for the decedent, and Marilyn's testimony that she rarely left the decedent's side and that Appellant rarely visited, we find that Appellees did not meet their burden of proof at trial. Accordingly, we find that there is merit to this assignment of error. The trial court's decision is not supported by the record and, thus, is manifestly erroneous or clearly wrong.

THIRD ASSIGNMENT OF ERROR

In his third assignment of error, Appellant argues that the trial court erred by failing to exclude the deposition testimony of Dr. Quillan. Particularly, Appellant claims that Dr. Quillan's testimony is inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), and La.Code Evid. art. 702. We find no merit in this contention.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

La.Code Evid. art. 702.

In *State v. Brannon*, 07–431, pp. 8-9 (La.App. 3 Cir. 12/5/07), 971 So.2d 511, 517–18, *writ denied*, 07–2465 (La. 5/9/08), 980 So.2d 689, this court explained the method of determining the admissibility of an expert's testimony:

> In *State v. Foret,* 628 So.2d 1116 (La.1993), the Louisiana Supreme Court adopted the test set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), regarding proper standards for the admissibility of expert testimony which requires the trial court to act in a gatekeeping function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *State v. Chauvin,* 02-1188 (La.5/20/03), 846 So.2d 697. To assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue, the Supreme Court suggested the following general observations are appropriate: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the methodology is generally accepted by the relevant scientific community. *Daubert,* 509 U.S. at 592-594, 113 S.Ct. 2786. In *Foret,* supra, the court adopted these observations as a helpful guide for our lower courts in considering this difficult issue. *Id.* Thus, Louisiana has adopted *Daubert's* requirement that in order for technical or scientific expert testimony to be admissible under La.[Code Evid. art.] 702, the scientific evidence must rise to a threshold level of reliability. *Daubert's* general "gatekeeping" applies not only to testimony based upon scientific knowledge, but also to testimony based on "technical" and "other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999); *Independent Fire Ins. Co. v. Sunbeam Corp.,* 99-2181 (La.2/29/00), 755 So.2d 226. The trial court may consider one or more of the four *Daubert* factors, but that list of factors neither necessarily nor exclusively applies to all experts or in every case. *Id.* Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determinations. *Kumho, supra* at 526 U.S. 142, 119 S.Ct. 1167.
>
> *State v. Allen,* 41,548, pp. 11-13 (La.App. 2 Cir. 11/15/06), 942 So.2d 1244, 1254-55 [,*writ denied*, 07-530 (La. 12/7/07), 969 So.2d 619].

In the instant case, Appellant asserts that, because Dr. Quillan spent only a brief amount of time personally evaluating the decedent and did not personally administer the neuropsychological test, his testimony is inadmissible. We disagree. During his brief personal encounter with the decedent, Dr. Quillan administered a mental status examination. Following this examination, he recommended the decedent undergo further cognitive function testing. Dr. Quillan's technician administered the RBANS test. The RBANS is a peer-reviewed and field accepted method to evaluate the neuropsychological status of adults. Its administration and scoring are standardized. The test generates raw data, which is then assigned a numerical score. Because the test is standardized, it is not necessary to conduct a lengthy personal interview with the subject to determine their mental status. Nor is it necessary for the interpreter to have actually administered the test. Additionally, the technician who administered the test to the decedent had a bachelor's degree in psychology and was trained in administering psychometric tests.

Appellant also asserts Dr. Quillan's testimony is inadmissible because his personal examination of the decedent took place approximately seven months prior to the execution of the 2011 codicil. This assertion is remiss. Dr. Quillan's testimony was based on sufficient facts and data and aided the trier of fact in understanding the nature of the decedent's condition, its likelihood of improvement, and its long-term effect on the decedent's capacity. As such, it is admissible under La.Code Evid. art. 702. Therefore, we find this assignment of error without merit.

ANSWER TO APPEAL

Appellees assert in their answer to the appeal that the trial court erred in finding the form of the execution of the 2011 codicil valid. Having affirmed the trial court's finding that the decedent lacked testamentary capacity at the time the 2011 codicil was executed, there is no need to address the form of the codicil.

14

CONCLUSION

For the foregoing reasons we affirm the trial court's judgment.  All costs of this appeal are assessed to Appellant.

**AFFIRMED.**